546 A.2d 132

City of New Castle, Petitioner *v.* Workmen's Compensation Appeal Board (Sallie), Respondents.

Argued March 22, 1988, before Judges MACPHAIL and COLINS, and Senior Judge KALISH, sitting as a panel of three.

*Kemal Alexander Mericli,* with him, *Francis E. Pipak, Jr.,* and *Louis C. Long, Meyer, Darragh, Buckler, Bebeneck & Eck,* for petitioner.

*Robert H. Isbell,* with him, *Charles F. Gilchrest, Routman, Moore, Goldstone & Valentino,* for respondent, Earl A. Sallie, Deceased/Nora Lee Sallie, Widow.

OPINION BY JUDGE MACPHAIL, July 20, 1988:

The City of New Castle (City) appeals here the order of the Workmen's Compensation Appeal Board (Board) which affirmed the award of fatal claim benefits rendered by Referee Marvin Luxenberg (Referee) to Nora Lee Sallie (Claimant), widow of Earl A. Sallie (Decedent), on the basis that the Decedent died as a result of a fatal disease he contracted from a co-worker while he was within the course of his employment. We affirm.

Decedent was employed as a supervisor by the City in the City's weatherization program. On June 4, 1981, at approximately 7:30 o'clock a.m., the Decedent left his home to go to work in seemingly good health. Two hours later, the Decedent returned home complaining that he did not feel well. He exhibited violent chills, an elevated body temperature, a purple mark on his left elbow and was non-responsive to stimuli.

As the day progressed the Decedent's condition worsened, and he was then transported to St. Francis Hospital at approximately 6:30 p.m. In the emergency

room, he was examined by Dr. Wadhwa, a board-certified specialist in internal medicine, who diagnosed the Decedent as suffering from meningococcal septicemia.[1] A blood culture of the Decedent's blood was done which later showed the presence of the organism Neisseria meningitis in the Decedent's blood.

The Decedent was then transferred to Presbyterian Hospital in Pittsburgh where he was examined by Doctors Mullen and Dixon, who diagnosed the Decedent as being meningococcic. As the night progressed, the Decedent's blood pressure fell and continued to fall until approximately 5:30 a.m. when he suffered a cardiopulmonary arrest from which he died shortly thereafter. The Decedent's death was listed as cardiopulmonary arrest caused by septic shock[2] which was a direct consequence of the meningococcal septis.

On June 5, 1981, throat and nasal cultures were taken from twenty-one (21) of the Decedent's fellow employees, seven of which were cultured. One employee (Co-employee) tested positive for the Neisseria organism. Co-employee was determined to be a carrier of the disease, as she was asymptomatic, *i.e.*, having no ill effects from having the organism present in her nasal pharynx.

The Neisseria meningitis organism survives only in the nasal pharynx and is transmitted through inhalation of droplets of infected nasal pharyngeal secretions. Not every person exposed to the organism, however, is susceptible to the ill effects of the disease. Statistics show

---

[1] Meningococcal septicemia is caused by the presence of the organism Neisseria meningococci or meningitis in the bloodstream, which causes a poisoning of the blood, and in extreme cases results in death.

[2] Septic shock is the inadequate profusion of blood, due to the patient's low blood pressure, to certain vital organs of the body including the brain and the kidney.

that seventy (70) percent of the adult population who are exposed to the disease are not susceptible to its ill effects, while approximately thirty (30) percent of the population have no immunity to it, and seven to ten (7-10) percent become carriers of the disease. N.T. at 17-18, R.R. at 150A-151A.

Several days to two weeks before the Decedent died, he was observed kissing Co-employee on the cheek prior to her leaving for maternity leave. The Claimant contended that the Decedent contracted this fatal disease from Co-employee, who was a carrier of the disease, while the Decedent was at work in the course of his employment. The Referee agreed and awarded workmen's compensation benefits to Claimant. City appealed to the Board, which, without taking any additional evidence, affirmed the Referee's decision. The City now appeals to this Court for review.

First we must determine whether the Board erred in finding that the Decedent 1) suffered a compensable injury, and 2) suffered the injury while he was within the course of his employment.[3] Section 301(c) of The Pennsylvania Workmen's Compensation Act (Act), June 2, 1915, P.L. 736, *as amended*, 77 P.S. §411(1) provides in pertinent part:

> The term 'injury arising in the course of his employment,' as used in this article . . . shall include all . . . injuries sustained while the employe is actually engaged in the furtherance of the business or affairs of the employer, whether on the employer's premises or elsewhere, and

---

[3] Our scope of review of an administrative agency decision is limited to determining whether constitutional rights were violated, an error of law was committed, or necessary findings of fact are supported by substantial evidence. *Pypers v. Workmen's Compensation Appeal Board (Baker)*, 105 Pa. Commonwealth Ct. 448, 524 A.2d 1046 (1987).

shall include all injuries caused by the condition of the premises . . . sustained by the employe, who, though not so engaged, is injured upon the premises occupied by or under the control of the employer . . . the employe's presence thereon being required by the nature of his employment.

The Act sets forth that for workmen's compensation purposes, an employee will be considered to have suffered an injury arising in the course of employment where the employee is injured while actually engaged in furtherance of the employer's business or affairs. *See Pypers.* In *Dupree v. Barney,* 193 Pa. Superior Ct. 331, 341, 163 A.2d 901, 907 (1960), the court held that "[a]n employee may be doing something other than the exact work assigned to him, and he may not be strictly at his assigned work, either as to time or place, yet the continuity of the employment is not broken unless such activity is wholly foreign to his employment or constitutes an abandonment thereof." (Citation omitted.)

In *Hall v. Carnegie Institute of Technology,* 170 Pa. Superior Ct. 459, 87 A.2d 87 (1952), the decedent died as a result of a self-inflicted gunshot wound. The decedent was a clerk in a school chemical storeroom where his duties entailed the making of an annual inventory. The referee found that on the night in question, the decedent went to consult with a professor about supplies for the professor's lab, when he encountered one of the special policemen employed by the college in the professor's office. The officer was showing his gun to the professor who was reluctant to take it. The officer then assured her that the gun was empty by showing her the bullets from the gun which he held in his other hand. The decedent then took the gun from the officer, placed it to his head, and pulled the trigger. The court reasoned:

At the time of his fatal injury, Hall was in a place where his employment required him to be; he was killed as the result of what would have been merely a harmless prank if the facts had been as he reasonably supposed them to be; . . . Under such circumstances, *the deviation of the employe must be classed as 'merely an innocent or inconsequential departure from the line or place of duty.'* The employe's act should not be judged in the light of unexpected and unforeseen consequences of it; and no one would contend that Hall had abandoned his employment if during a brief leisure period he had placed an *empty* revolver to his head and pulled the trigger.

*Id.* at 464, 87 A.2d at 90 (emphasis added).

In the instant case, the Decedent was in a place where his employment required him to be; he died as the result of what would have been merely a harmless act of goodwill toward Co-employee. Thus, in light of *Hall,* we have classified the act of the Decedent as being merely an innocent or inconsequential departure from his line of duty.

City contends that the Claimant has not shown that his actions were condoned or encouraged by City. The burden of proving that the Decedent's act was a violation of a positive order or instruction of the Employer, thus taking the Decedent out of the course of employment, is on City. *See Kenny v. Thornton-Fuller Co.,* 190 Pa. Superior Ct. 552, 155 A.2d 220 (1959). Absent such a showing by the City, we conclude that the Decedent's act of goodwill towards Co-employee was neither foreign to his employment nor did it constitute an abandonment thereof. We further conclude that the Decedent was within the course of his employment when the event occurred which activated his injury and death.

We now proceed to consider whether the injury sustained by the Decedent is compensable under the Act. It appears that Pennsylvania has never addressed the specific issue of whether a disease contracted solely because a co-worker has communicated that disease, is compensable. In an effort to resolve this issue, however, we are reminded of the liberal construction to be given to the Act. *Holshue v. Workmen's Compensation Appeal Board (Robideau Express)*, 84 Pa. Commonwealth Ct. 253, 479 A.2d 42 (1984).

Prior to the 1972 amendment of the Act, Pennsylvania did not allow recovery for any injury unless there was violence to the physical structure of the body, *i.e.*, in the "germ" disease cases, there must have been trauma such as a scratch or a blow in order for one to recover. *See Cole v. Pennsylvania Power & Light Co.*, 197 Pa. Superior Ct. 648, 180 A.2d 272 (1962) and 1 A. BARBIERI, Pennsylvania Workmen's Compensation and Occupational Disease §§3.05, 3.06, 3.09 (1975). Under the 1972 amendments to the Act, the Claimant no longer has to prove an "accident" or that there was "physical trauma" to the body; an injury sustained after May 1, 1972 is compensable if it arises in the course of employment and is related thereto. *See Workmen's Compensation Appeal Board v. Bernard S. Pincus Co.*, 479 Pa. 286, 388 A.2d 659 (1978).

In 1 A. LARSON, Workmen's Compensation Law §8:50 (1984) the author in his discussion of this issue states that if the particular jurisdiction involved is one that permits the award of diseases generally, then such a disease would be compensable on the theory that: 1) the employment caused the exposure; 2) the risk of contagion from the fellow employee was a risk of the employment; and 3) employment throws men and women together at close quarters and thereby increases the risk of contagion. If the jurisdiction is one that requires

added or peculiar risks, then such diseases would not be compensable on the theory that there is risk of such contagion on the street, on buses, and movie theaters and the like.

Thus, since the Act does not require added or peculiar risks but simply compensates for injuries arising within the course of employment and related thereto, it is our conclusion that the Decedent's injury, *i.e.,* the contraction of miningococcal septicemia, is compensable under the 1972 amendments of the Act.

City contends that the Board in construing the Act to include a non-occupational contagious disease as a compensable injury, has rendered the Act unconstitutional as applied. The Claimant, in response to this question, alleges that the City waived its claim of unconstitutionality by failing to raise this issue in its appeal before the Board. We agree.

Pa. R.A.P. 1551(a)(1) states that no question shall be heard or considered by the court which was not raised before the government unit, except questions involving the validity of a statute. In the instant case, City does not attack the *validity* of the Act; rather it argues that the Board's decision unconstitutionally expands coverage of the Act to injuries outside the course of employment. City also contends that the Board's decision unconstitutionally permits recovery for the contraction of a contagious disease without proof that the disease is an occupational disease under Section 108(n) of the Act, 77 P.S. §27.1(n), added by Section 1 of the Act of October 17, 1972, P.L. 930, *as amended.* Both of these matters should have been raised before the Referee and the Board.

Finally, City contends that the Board erred in finding there was sufficient unequivocal medical testimony to show that Decedent's fatal disease was contracted at work from Co-employee.

The Referee found that the testimony of Dr. Wadhwa, Dr. Isidro and Dr. Mullen was credible and concluded that the death of Decedent was directly caused by Neisseria meningitis. The Referee also found that the Decedent contracted Neisseria meningitis from personal contact with Co-employee while both were employees of the City, while both were working in the course of their employment and while both were furthering the business of their employer.

In cases where there is no obvious causal relationship between a claimant's condition and a work injury, unequivocal medical testimony must be produced to establish that connection. *Fessler v. Workmen's Compensation Appeal Board (Nationwide Insurance Co.),* 86 Pa. Commonwealth Ct. 198, 484 A.2d 422 (1984). In *Haney v. Workmen's Compensation Appeal Board,* 65 Pa. Commonwealth Ct. 461, 442 A.2d 1223 (1982), this Court stated that a showing of unequivocal testimony is clearly established where there is an expression of a medical opinion, or where the expert testifies that in his professional opinion there is a relationship, or that the expert thinks or believes there is a relationship between the injury and course of employment. The testimony of the expert must be considered as a whole and complete medical certainty is not required. *See Lyons Transportation Lines, Inc. v. Workmen's Compensation Appeal Board (Pogany),* 84 Pa. Commonwealth Ct. 546, 480 A.2d 358 (1984).

In the instant case the medical testimony reads as follows:

Direct Examination of Dr. Wadhwa:

Q. I'm going to now ask you a hypothetical question, Dr. Wadhwa. Please listen carefully to the facts stated in the question and assume they're true, if you will please in answering the question. Assume please, Dr. Wadhwa, that Mr.

Earl Sallie had been exposed during the week of his death to a person at his place of employment by the City of New Castle, who on June 5, 1981 showed a positive culture from her nasal opening for the presence of Neisseria meningitis.

Assuming this fact to be true, and based upon your examination of Mr. Sallie at the St. Francis Hospital on June 4, 1981 and the chemical tests that were performed on Mr. Sallie on June 4, 1981, do you have an opinion to a reasonable medical certainty as to the source of the meningococcal septicemia which you diagnosed Mr. Sallie was suffering from on June 4, 1981?

MR. PIPAK: Before you answer, Doctor, I'll place an objection on the record because the hypothetical assumes facts not in evidence.

Q. You may now answer the question; do you have an opinion, Doctor?

A. With a reasonable medical certainty?

Q. Yes.

A. He may have been exposed to that carrier and he got infected from that person. . . .

N.T. at 14-15, R.R. at 127A-128A.

Testimony by Dr. Mullen:

Assume, please, Dr. Mullen, that Earl A. Sallie had been exposed at his work during the week of his death, June 1 to June 4, to a co-worker at his place of employment by the City of New Castle who on June 5, 1981, showed a positive culture from the nasopharynx for the presence of Neisseria meningitis. Assume further, Dr. Mullen, that on June 4, 1981, at about 6:30 p.m., Earl Sallie was transported to the emergency room of the St. Francis Hospital in New Castle, Pennsylvania. At St. Francis, Dr. Kamal Wadhwa, M.D. observed that Mr. Sallie was

quite lethargic, confused, was febrile with a high grade fever and had a body temperature of 106 degrees Fahrenheit, was having respiratory problems and had a rapid pulse.

While at the St. Francis Hospital emergency room on June 4, 1981, a blood culture test was done on Mr. Earl Sallie, which proved the presence of Neisseria meningitis serol type B.

Later on in the evening of June 4, 1981, Earl A. Sallie was, then, transferred and transported to the Presbyterian University Hospital in Pittsburgh.

Assume further, please, Doctor, that on June 5, 1981, seven people were cultured at the Jameson Memorial Hospital in New Castle, Pennsylvania, at the direction of the pathologist, Dr. Eugenio Isidro, that those cultures consisted of throat and nasal cultures, and that six of the people were negative for Neisseria meningitis, and one was positive, that being the co-worker that Mr. Sallie had been exposed to at his place of work during the week of his death, June 1 to June 4, 1981.

Assuming all those facts to be true, Dr. Mullen, and also considering your observations of Earl A. Sallie at the Presbyterian University and your observations regarding the circumstances of his death at the Presbyterian University Hospital on June 5, 1981, do you have a professional medical opinion to a reasonable degree of medical certainty as to the cause of the Neisseria meningitis and meningococcal sepsis which you diagnosed in Earl A. Sallie, Doctor?

MR. PIPAK: Before you answer, Doctor, I want to place an objection on the record because I believe the question assumes facts that are not

in evidence, specifically with reference to exposure to this co-worker during the course of employment in the week of June 5, 1981. That [sic] my objection.

Q. Do you recall the question, Doctor?

A. Yes.

Q. Do you have a professional medical opinion to a reasonable medical certainty?

A. I can answer in a statement that Mr. Sallie, certainly died of meningococcal sepsis which could only be caused by Neisseria meningitis. In this case, it was Neisseria meningitis serologic type B, the same that was isolated in the person mentioned whom he had worked with. Mr. Sallie had to have been exposed in the recent past before his demise to Neisseria meningitis. If all efforts were made to obtain cultures from each person he had been exposed to and only one person did have this Neisseria meningitis, then we would have to say that he didn't get it from another person. I could say with a reasonable medical certainty that it would have come from this person whom he would have been exposed to.

N.T. at 26-29, R.R. at 183A-186A.

It is our conclusion that, under the circumstances of this case, the medical testimony of Drs. Mullen and Wadhwa was unequivocal within the guidelines set forth in *Haney.*

It is obvious that we are dealing here with a very rare disease, communicable only under very rare circumstances. We do not reach the issue of whether ordinary infections, such as the common cold and other more common communicable diseases contracted from others in the workplace, or in the population at large, constitutes an injury under the Act.

Having found that the Referee's findings were supported by substantial evidence, that there was no error of law and no constitutional violations, we consequently affirm the Board's decision granting benefits to the Claimant.

ORDER

The order of the Workmen's Compensation Appeal Board in the above-captioned matter is affirmed.